JULIUS ROBERTSON, Respondent, *v.* THE NATIONAL STEAMSHIP
COMPANY, LIMITED, Appellant.

*It seems* that when a carrier of goods deviates from the route stipulated in
his bill of lading, he becomes an insurer, and so, responsible for all
loss and damage to the goods, even from unavoidable casualty.

Defendant had a line of steamers running between London and New York.
It received goods at Havre for transportation to New York *via* London.
These goods were transported from Havre to Southampton by steamers,
and from that place to London by railroad, where they were shipped on
defendant's steamers. The steamers from Havre and the railroad were
owned by another company, which had thus a regular line of transpor-
tation from Havre to London. Its steamers never went further than South-
ampton. One of them was the *Wolf*. Neither said company nor defendant
ever carried any goods entirely by water to London. The business had
been carried on as above stated for many years, and the method of doing it
was notorious and well known to persons dealing with defendant's agents
at Havre. Said agents received from I. & M. certain packages of
merchandize, issuing to them a bill of lading, by which they acknowl-
edged the receipt of the goods, "to be forwarded by the steamer
*Wolf* to London and to be there trans-shipped" on board one of defend-
ant's steamers named, lying in the port of London, bound for New York.
The bill of lading contained a stipulation exempting defendant from
perils " of land transit, of whatsoever nature or kind." The merchandise
was shipped on board the *Wolf*, carried to Southampton, thence by rail
to London, and there shipped on board defendant's steamer and carried
to New York. On arrival there it was found to be damaged. In an
action to recover the damages, on the ground that defendant had become
an insurer of the goods, because of a deviation in the route stipulated,
*held*, that there was no deviation; that it appears by the contract itself,
and by the circumstances, that the parties contemplated a carriage by
the *Wolf* to Southampton, and thence by rail to London; that the proof
of usage was proper to be considered, as it did not contradict, but was
simply explanatory of the bill of lading.

It was claimed by plaintiff that one K., living at Hamburgh, was the owner
of the goods when they were shipped; that he could not be charged with
knowledge of the usage and was not bound thereby. *Held*, untenable,
because, first, if K. was the owner and shipper, it was incumbent upon
him to show that he was ignorant of the usage; second, as I. & M.
made the contract as principals, disclosing to defendant no agency, if
they were agents, defendant had the right to treat them as principals,
and the contract was to be construed precisely as if they were; third,
assuming that I. & M. were agents for K., and made the contract for

his benefit, the knowledge of the usage the law attributes to his agents must be attributed to and binds him.

(Argued June 26, 1893; decided October 10, 1893.)

APPEAL from judgment of the General Term of the Superior Court of the city of New York, entered upon an order made February 8, 1892, which affirmed a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to recover damages to goods while being transported by defendant from Havre to New York.

The facts, so far as material, are stated in the opinion.

*John Chetwood* for appellant. The goods having been forwarded by the steamer named in the bill of lading, and the damage to the goods (if any) done before the goods actually came into the defendant's possession or shipped on board its vessel, the defendant is not liable. (*Reed* v. *U. S. E. Co.*, 48 N. Y. 466 ; *Isaacson* v. *N. Y. C. & H. R. R. R. Co.*, 94 id. 283 ; *Ricketts* v. *B. & O. R. R. Co.*, 4 Lans. 446 ; 59 N. Y. 637.) Plaintiff has no cause of action. The damp, wet state of the skins was caused by inherent deterioration. The shipowner is not responsible for this. (Hutchinson on Carriers, § 125.) The sacredness of the bill of lading as against modification or explanation in any respect does not exist. (*Meyer* v. *Peck*, 28 N. Y. 590, 596 ; *Nelson* v. *Stevenson*, 5 Duer, 538, 551; *Creery* v. *Holly*, 14 Wend. 26–29 ; *Ellis* v. *Willard*, 9 N. Y. 530.) The evidence shows conclusively that the route by the *Wolf* and the Southwestern railway was the well-known route by which alone for years goods for shipment by defendant's steamers had been forwarded. The *Wolf*, on which the goods were laden, never went any other route. The knowledge of plaintiff, a shipper by defendant's steamers of twenty years' experience, of this custom is in fact proved. But whether proved or not, the universal custom to forward goods by that route was proven.

(*Hostetter* v. *Park*, 11 U. S. 1; *Lowrey* v. *Russell*, 8 Pick. 360; *Johnson* v. *Depeyster*, 50 N. Y. 666.)

*Lewis Sanders* for respondent. No motion having been made raising the question of the sufficiency of plaintiff's evidence, the question cannot be raised for the first time on appeal. (*Simmons* v. *Law*, 8 Bosw. 219; *Newstadt* v. *Adams*, 5 Duer, 48; *Ellis* v. *Willard*, 9 N. Y. 534, 535.) The goods were opened for inspection, there being no covering over the bales. In such cases the admission in the bill of lading of receipt in good order and good condition should be conclusive on the carrier. (*Barrett* v. *Rogers*, 7 Mass. 297; *Clark* v. *Barnwell*, 12 How. 272.) A deviation avoids the exculpatory exceptions. (*Maghee* v. *C. & A. R. R. Co.*, 45 N. Y. 514; *Bostwick* v. *B. & O. R. R. Co.*, Id. 712.) The carrier may bind itself by a contract to carry beyond the point of its own terminus. (*Maghee* v. *C. & A. R. R. Co.*, 45 N. Y. 518.) A bill of lading is like any other contract in writing, and cannot be altered or contradicted by parol. (*Fitzhugh* v. *Winan*, 9 N. Y. 566.) The difference between the market price of the goods as delivered and as contracted to be delivered is the measure of plaintiff's damage. (*Cutting* v. *G. T. R. Co.*, 13 Allen, 386; *Ward* v. *N. Y. C. R. R. Co.*, 47 N. Y. 31; *Sherman* v. *H. R. R. Co.*, 64 id. 254; *Sturgess* v. *Bissell*, 46 id. 455.) The ownership of the *Wolf* is wholly immaterial; the admitted contract of carriage creates the only obligations. (*Wilcox* v. *Parmelee*, 3 Sandf. 610.)

Earl, J. In June, 1889, the defendant had a line of steamers running between London and New York. It received goods at Havre in France for transportation to New York by way of London. It transported such goods from Havre to Southampton on board of steamers, and from that place to London by railroad, where they were trans-shipped to its steamships, to be carried to New York. The steamships running between Havre and Southampton and the railroad from Southampton to London were owned and operated by the

London and Southwestern Railroad Company. The agents representing the defendant at Havre, on the 8th of June, 1889, received from Isabelle and Munster forty-five packages of merchandise and issued to them a bill of lading in which they acknowledged the receipt of the merchandise to be forwarded "by·the steamer *Wolf* to London, and to be there transshipped in and upon the steamship called *Canada*   *   *   * lying in the port of London and bound for New York, with liberty to sail with or without pilots, to call at Havre, Queenstown, Southampton, Plymouth, or any other port or ports, and to tow and assist vessels in all situations and to all ports, and failing shipment by said steamer, then by following stéamer of this line, for which the goods shall arrive in time." The bill of lading, contained stipulations exempting the defendant from various perils, and among them from perils of "land transit of whatsoever nature or kind." Isabelle and Munster appeared in the bill of lading as principals, not as agents. The merchandise, having been shipped on board the steamer *Wolf*, was carried to Southampton and from thence by rail to London, where it was transshipped to the steamer *Canada*, and upon its arrival in New York it was found to be damaged. The plaintiff, who was the consignee, and who had become the owner of the merchandise, brought this action to recover against the defendant for the damage done to it, and he recovered on the sole ground that the defendant became an insurer of the merchandise, because it did not transport it from Havre to London on the steamer *Wolf*, and that thus there was a deviation from the route stipulated by the transportation by rail from Southampton.

It cannot be disputed that if there was such a deviation as is claimed the defendant became an· insurer, and thus responsible for all loss and damage to the merchandise, even from unavoidable casualty. (*Maghee* v. *Camden and Amboy R. R. Co.*, 45 N. Y. 514.)

But we do not think there was any deviation from the mode of transportation prescribed by the contract made between the parties. If we read the shipping bill alone it is not

entirely certain that the merchandise was to be transported
from Havre to London all the way by water on board the
steamer. The language in the bill of lading is, "to be for-
warded by the steamer *Wolf* to London," and in a real sense
goods received on board the *Wolf* may be said to have been
forwarded by that steamer to London by carrying them to
Southampton, and then sending them by rail to London. The
bill seems to provide for a carriage upon land, as it exempted
the defendant from loss or injury from perils by land trans-
portation of any kind, and the only land transportation upon
this route was from Southampton to London. Thus it appears
that the shippers and the defendant, when they made the con-
tract, contemplated not only a carriage upon water, but upon
land also.

But when the circumstances surrounding the making of the
contract for the carriage are considered, it becomes entirely
plain that the parties contemplated a contract for a carriage
by the *Wolf* to Southampton, and thence by rail to London.
The London and Southwestern Railroad Company had a
regular line of transportation from Havre to London, by
steamer to Southampton and thence by rail to London, and
for that purpose they had three vessels, making three trips
weekly between those points, of which the *Wolf* was one.
Those vessels never went further than Southampton, and the
London and Southwestern Railroad Co. never carried any
goods by water to London, and neither did the defendant, and
the business had been carried on this way for many years, and
the mode of doing it was notorious and well known. It was
advertised in the newspapers at Havre, and was specified in
way bills used in Havre by the agents of the London and
Southwestern Railroad Company in the transaction of its busi-
ness. The mode of doing the business was such, and so open
and notorious that it must have been known generally at
Havre, and particularly by persons there dealing with the
agents of the defendant and of the London and Southwestern
Railroad Company. It must be assumed that the contract
between the parties was made with reference to this well-

known usage, and it is binding upon the shippers just as if written in the bill of lading. In this particular case the proof of the usage does not contradict the bill of lading, but is simply explanatory of it. (*Hostetter* v. *Gray*, 11 Fed. Rep. 181; *Lowry* v. *Russell*, 8 Pick. 360; Phillips on Ins. [5th ed.] § 980.) In *Lowrey* v. *Russell*, it was held that a "bill of lading, like other contracts, is to be construed according to the intention of the parties. Usage of trade is always presumed to be within the knowledge of the parties, and their contracts are supposed to be made with reference to it."

But it is said that the owner of this merchandise was J. Kalmes, Jr., living at Hamburgh; that it does not appear that he made the contract at Havre; that he cannot be supposed to have known the usage, and that he cannot, therefore, be bound thereby, and that as to him it cannot be read into the contract of transportation. There are four complete answers to this position: (1) If Kalmes was the owner and shipper of this merchandise it was incumbent upon him to show that he was ignorant of this notorious and uniform usage. (*Johnson* v. *DePeyster*, 50 N. Y. 666.) (2) It does not appear that he owned this merchandise at the time the contract for transportation was made. In the bill of lading, Isabelle and Munster are described as the shippers from whom the merchandise was received, and with whom the contract for its transportation was made. They did not contract as agents or, so far as the record shows, disclose any agency. After the bill of lading was issued to them they indorsed it to another party and that party indorsed it to Kalmes, and it appears by the invoice of the goods obtained from the custom house and proved upon the trial, that the plaintiff bought the merchandise of Kalmes at Hamburgh, on the 12th of June, four days after the bill of lading was issued to Isabelle and Munster. It appears, therefore, *prima facie* that Isabelle and Munster were the owners of the goods, and that Kalmes became the purchaser from them by indorsement and assignment of the bill of lading. (3) But if Isabelle and Munster were not the owners they made the

contract as principals, disclosing to the defendant no agency, and giving up no principal. Therefore, the defendant has the right to treat them as principals, and the contract, as to its force and effect, must be construed precisely as if they were principals and not agents. (4) But if we assume (which is the only other alternative) that they were the agents of Kalmes and made the contract really for his benefit, he being the owner of the merchandise, then he is affected by the same knowledge which they possessed, and if the law attributes knowledge of this usage to them at the time they made the contract for their principal, then the same knowledge must be attributed to him, and binds him.

Therefore, in any view that can be taken of this case, if the parties when they entered into this contract of carriage did it with knowledge of this uniform and notorious usage, then the owner or owners of the merchandise, and the plaintiff who claims under him or them, were bound by it, and there was no deviation from the contract which makes the defendant liable as insurer for the damage to the goods.

The judgment should, therefore, be reversed and a new trial granted, costs to abide the event.

All concur, except GRAY, J., dissenting.

Judgment reversed.